

FILED
2016 NOV 22 AM 9:42
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | INFORMATION |
| Plaintiff, | ) ) | 1:16 CR 365 |
| v. | ) ) | CASE NO. _____ JUDGE LIOI |
| DANIEL J. MERCEDE, | ) ) ) | Title 18, United States Code, Sections 1344, 1029(a)(2), 1960, and 2 |
| Defendant. | ) | |

The United States Attorney charges:

### GENERAL ALLEGATIONS

At all times material to this Information:

A.  <u>Defendant and Relevant Entities</u>

1. Defendant DANIEL J. MERCEDE (hereinafter "Defendant") resided in the Northern District of Ohio.

2. Defendant established Cryptocoin Capital Management LLC (hereinafter, "Cryptocoin Capital Management") on or about June 6, 2014.

3. Defendant established CCCM LLC (hereinafter, "CCCM") on or about September 2, 2014.

4. Defendant established CCCAP Management LLC (hereinafter, "CCCAP Management") on or about September 12, 2014.

5.   Defendant established CCCapital Management LLC (hereinafter, "CCCapital Management") on or about September 12, 2014.

6.   Defendant established CCCM Trading LLC (hereinafter, "CCCM Trading") on or about September 12, 2014.

7.   Defendant established Mercede's Limited Investments LTD. (hereinafter, "Mercede's Limited Investments") on or about December 5, 2014.

8.   Defendant established Mercede's Inevestments [sic] LTD. (hereinafter, "Mercede's Inevestments") on or about December 15, 2014.

9.   Defendant established Mercede's Trading Company LLC (hereinafter, "Mercede's Trading Company") on or about December 15, 2014.

10.  Cryptocoin Capital Management, CCCM, CCCAP Management, CCCapital Management, CCCM Trading, Mercede's Limited Investments, Mercede's Inevestments, and Mercede's Trading Company (hereinafter, "Defendant Companies") were purportedly engaged in the business of, among things, buying and selling bitcoin, a cryptocurrency.

11.  Pentagon Federal Credit Union (hereinafter, "PenFed") was a financial institution as defined by Title 18, United States Code, Section 20, whose accounts were insured by the National Credit Union Administration.

12.  JP Morgan Chase Bank, N.A. (hereinafter, "Chase Bank"), US Bank National Association (hereinafter, "US Bank"), Bank of America (hereinafter, "BOA"), BB&T, Citibank N.A. (hereinafter, "Citibank") and United Services Automobile Association (hereinafter, "USAA") were financial institutions as defined by Title 18, United States Code, Section 20, whose accounts were insured by the Federal Deposit Insurance Corporation ("FDIC").

2

13. ScoreBig was a company based in Hollywood, California that sold tickets to live events and amusement parks. ScoreBig acquired tickets for live events and amusement parks at discounted rates and sold them for profit. ScoreBig's activities affected interstate commerce.

14. StubHub was an online ticket marketplace, based in San Francisco, California, that enabled people to buy and sell tickets to live events. StubHub's activities affected interstate commerce.

B. United States Post Office Mail Holds

15. A mail hold was a service that could be placed on an individual's mail by the United States Post Office (hereinafter, "Post Office") that requested that the individual's mail be placed on hold for any particular period of time. During a mail hold, the Post Office held the mail and did not deliver it until the date requested by the customer. After the mail hold expired, depending on the customer request, the mail was either delivered on the day after the hold expired, or the customer went to the Post Office and retrieved the mail using his or her photo identification.

16. A change of address was a request that could be completed by submitting a Change of Address Form—either electronically online, or in paper form at any Post Office. The paper form was given directly to a clerk at the Post Office or mailed to a Post Office. Once the Post Office received the change of address request, it sent a packet to both the old address and the new address confirming the request was in fact made. However, if a customer's mail was placed on hold, and then a Change of Address was completed, the customer did not receive the confirmation of the change of address because the mail was placed on hold.

17. A "premium mail forwarding" was a request that could be placed on a customer's mail, which was slightly different from a change of address. A premium mail forwarding was a

paid service, whereas a change of address and mail hold were free services. When a premium mail forwarding was placed on a customer's mail, the Post Office for the intended address held the mail, placed it into a priority mailing box, then sent the mail to the customer's forwarding address. A premium mail forwarding also forwarded packages, whereas a change of address forwarded express or priority mailings.

      C.      <u>FinCEN, Money Service Business, and Bitcoin</u>

      18.      Financial Crimes Enforcement Network ("FinCEN") was a bureau of the United States Department of the Treasury. FinCEN safeguarded the financial system from illicit use, combated money laundering, and promoted national security through the collection, analysis, and dissemination of financial intelligence and strategic use of financial authorities.

      19.      The current rules amended in 1999 by FinCEN revised the regulatory definitions of certain non-bank financial institutions for purposes of the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5330 *et. seq.*, and grouped the definitions into a separate category of financial institutions called "money services businesses" or "MSB". Under applicable BSA regulations, an MSB was a "person wherever located doing business, whether or not on a regular basis or as an organized or licensed business concern, wholly or in substantial part within the United States, in one or more of the capacities listed in . . . [applicable BSA regulations]," including, among other things, a "money transmitter."

      20.      Under applicable BSA regulations, a "money transmitter" included a "person that provides money transmission services." The term "money transmission services" meant "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." "Any means" included, but was not limited to, "through a

4

financial agency or institution; a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve System, or both; an electronic funds transfer network; or an informal value transfer system[.]"

21. With few exceptions, each MSB was required to register with the Department of the Treasury. Registration of an MSB was the responsibility of the owner or controlling person of the MSB. The form, Registration of Money Services Business, FinCEN Form 107, was required to be completed and signed by the owner or controlling person and filed within 180 days after the date on which the MSB was established.

22. Bitcoin was a digital crypto currency and payment system released in 2009. The system was peer-to-peer—that is, transactions were conducted directly between users without an intermediary. Bitcoin transactions were verified by network nodes and were recorded in a publicly distributed ledger called the blockchain.

23. A digital wallet or bitcoin wallet was an electronic device, similar to a bank account, that allowed a wallet holder to, among other things, receive and store bitcoins and send bitcoins to others. A software wallet was one that was installed on the wallet holder's computer or mobile device. A web wallet or hosted wallet was one that was hosted by a third party.

24. LakeBTC.com (hereinafter, "LakeBTC") was a virtual bitcoin exchange service based in China. LakeBTC's activities affected interstate and foreign commerce.

25. LocalBitcoins.com (hereinafter, "LocalBitcoins") was a virtual bitcoin exchange service based in Finland. LocalBitcoins facilitated over-the-counter trading of fiat currency, such as U.S. dollars or Euros, for bitcoin. Users posted advertisements on LocalBitcoins' website, where they stated exchange rates and acceptable payment methods for buying and selling bitcoin. Users replied to the advertisements and agreed to meet in person to exchange

bitcoin for cash, or agreed to use online banking to conduct the transactions. LocalBitcoins' activities affected interstate and foreign commerce.

## COUNT 1
### (Bank Fraud, 18 U.S.C. § 1344 and 2)

The United States Attorney further charges:

26. The United States Attorney realleges and incorporates by reference the allegations set forth in paragraphs 1 through 25 of the Information as if fully set forth herein.

27. From in or around July 2014 to in or around May 2016, the exact dates being unknown to the United States Attorney, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant DANIEL J. MERCEDE executed and attempted to execute a scheme and artifice (a) to defraud PenFed, USAA, Chase Bank, US Bank, BOA, BB&T, Citibank and other financial institutions as defined by Title 18, United States Code, Section 20; and (b) to obtain moneys, funds, credits, assets, and other property owned by, and under the custody and control of, these financial institutions, by means of materially false and fraudulent pretenses, representations, and promises.

28. In the Northern District of Ohio, Eastern Division, and elsewhere, Defendant executed and attempted to execute the scheme and artifice to defraud as set forth above, in that he, without authorization and lawful authority, applied for fraudulent loans, credit cards, and other lines of credit in the names of others from PenFed and USAA, including those set forth below:

| PenFed | | |
|---|---|---|
| Customer Identity Used | Approximate Application Date | Loan Amount |
| K.A. | 01/01/2016 | $25,000 |
| M.B. | 03/31/2016 | $25,000 |

| | | |
|---|---|---|
| B.B. | 03/23/2016 | $25,000 |
| D.B. | 03/24/2016 | $25,000 |
| E.B. | 03/24/2016 | $25,000 |
| K.B. | 03/16/2016 | $25,000 |
| B.C. | 10/28/2015 | $25,000 |
| C.C. | 01/02/2016 | $25,000 |
| D.D. | 03/17/2016 | $25,000 |
| D.G. | 12/23/2015 | $25,000 |
| H.H. | 03/22/2016 | $25,000 |
| A.K. | 04/01/2016 | $25,000 |
| M.K. | 03/22/2016 | $25,000 |
| A.K. | 03/18/2016 | $25,000 |
| P.K. | 03/18/2016 | $25,000 |
| L.L. | 03/22/2016 | $25,000 |
| T.M. | 04/01/2016 | $25,000 |
| S.M. | 03/09/2016 | $25,000 |
| D.M. | 030/9/2016 | $25,000 |
| G.O. | 03/14/2016 | $25,000 |
| P.O. | 03/14/2016 | $25,000 |
| M.S. | 03/10/2016 | $25,000 |
| W.S. | 03/04/2016 | $25,000 |
| T.T. | 11/04/2015 | $25,000 |
| T.T. | 11/04/2015 | $25,000 |
| A.Z. | 11/04/2015 | $25,000 |
| A.L. | 02/27/2016 | $25,000 |
| L.N. | 02/26/2016 | $25,000 |
| M.N. | 02/27/2016 | $25,000 |
| J.G. | 04/11/2016 | $25,000 |

| USAA | | |
|---|---|---|
| Customer Identity Used | Approximate Application Date | Loan/Credit Amount |
| J.D. | 12/26/2015 | $150,000.00 |
| D.J. | 12/31/2015 - 01/01/2016 | $100,000.00 |
| J.C. | 12/31/2015 | $50,000.00 |
| T.T. | 11/04/2015 | $48,000.00 |
| D.M. | 11/16/2015 | $48,500.00 |
| D.M. | 11/19/2015 | $16,000.00 |

7

| D.J. | 12/27/2015 | $50,000.00 |
| --- | --- | --- |
| D.J. | 12/27/2015 | $16,000.00 |
| D.J. | 12/29/2015 | $16,000.00 |
| M.J. | 01/02/2016 | $2,000.00 |
| J.Y. | 01/07/2016 | $50,000.00 |

29. It was part of the scheme that Defendant stole and otherwise fraudulently obtained, without authorization or lawful authority, PII of individual victims, and used the stolen PII to submit, without authorization or lawful authority, fraudulent on-line loan applications in the victims' names to PenFed and USAA.

30. It was further part of the scheme that Defendant, in completing the fraudulent loan applications, used the victims' true addresses and PII, but, in order to conceal the discovery of the scheme, used fabricated telephone numbers and email addresses as contact information.

31. It was further part of the scheme that Defendant, after submitting a fraudulent loan application, used premium mail forwarding and change of address requests to change the victim loan applicant's address to a forwarding address so, in the event a fraudulent loan check was disbursed, the victim would not receive the check and discover Defendant's scheme.

32. It was further part of the scheme that Defendant used vacant and abandoned home addresses in the Northern District of Ohio, Eastern Division, as forwarding addresses where Defendant then retrieved fraudulently obtained loan checks mailed from PenFed and USAA.

33. It was further part of the scheme that Defendant used the victims' PII to establish new bank accounts at financial institutions other than PenFed or USAA in order to deposit Defendant's fraudulent loan proceeds.

34. It was further part of the scheme that when Defendant retrieved fraudulent PenFed or USAA loan checks from the forwarding addresses, Defendant mailed the checks to the newly opened bank accounts created in the victims' names for deposit. Defendant then immediately

accessed or attempted to access the fraudulent loan proceeds by transferring and withdrawing the money from the newly opened bank accounts, often causing the financial institution to suffer a loss after the financial institution discovered the deposit was fraudulent and dishonored and reversed the deposit.

35. It was further part of the scheme that Defendant fraudulently obtained and attempted to obtain unauthorized credit cards and other lines of credit in victims' names from Chase Bank, US Bank, BOA, BB&T, Citibank and other financial institutions, without authorization or lawful authority, and used those credit cards and lines of credit to make and attempt to make significant unauthorized purchases in order to enrich Defendant.

36. Defendant obtained, without authorization and lawful authority, the PII of more than 40 individual victims, and applied for more than $1,500,000 in fraudulent loans, credit cards, and other lines of credit from PenFed, USAA, Chase Bank, US Bank, BOA, BB&T, Citibank and other financial institutions, actually obtaining more than $400,000 in fraudulent proceeds, which Defendant used to enrich himself, all in violation of Title 18, United States Code, Section 1344 and 2.

## COUNT 2
### (Access Device Fraud, 18 U.S.C. §§ 1029(a)(2) and 2)

The United States Attorney further charges:

37. The United States Attorney realleges and incorporates by reference the allegations set forth in paragraphs 1 through 25 of the Information as if fully set forth herein.

38. From in or around October 2014 through November 2014, the exact dates being unknown to the United States Attorney, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant DANIEL J. MERCEDE did knowingly and with intent to defraud, use, attempt to use, and aid and abet the use and attempted use of, one or more unauthorized access

devices during any one-year period, and by such conduct obtained anything of value aggregating approximately $1,000 or more during that period, such conduct affecting interstate and foreign commerce.

39. Defendant engaged in a fraudulent credit card scheme by purchasing live event tickets through ScoreBig, using stolen and otherwise fraudulently obtained credit card information, and reselling the tickets through StubHub.

40. Defendant established user accounts with ScoreBig for the purpose of fraudulently purchasing live event tickets to resell them (the "fraudulent ScoreBig accounts"). In establishing the fraudulent ScoreBig accounts, Defendant, without lawful authority or authorization, used stolen and otherwise fraudulently obtained PII and credit card account information of real individuals, but used delivery information associated with himself for the delivery of the fraudulently purchased tickets.

41. Through the fraudulent ScoreBig accounts, Defendant used stolen and otherwise fraudulently obtained credit card information to make purchases of tickets to live events throughout the United States, including, among others, the ScoreBig transactions set forth below:

| Order Date | Amount | Identity Used | Credit Card Ending |
|---|---|---|---|
| 10/31/14 | $1000 | L.G. | ****0134 |
| 10/31/14 | $1000 | L.G. | ****0134 |
| 10/30/14 | $700 | L.W. | ****0971 |
| 11/03/14 | $1000 | A.P. | ****5321 |
| 10/31/14 | $600 | F.W. | ****8805 |
| 10/31/14 | $523 | F.W. | ****8805 |
| 11/03/14 | $1000 | J.B. | ****9307 |
| 10/29/14 | $300 | K.W. | ****9836 |

42. Once the tickets were delivered to Defendant's residence(s), which were located in the Northern District of Ohio, Eastern Division, he resold them on StubHub, typically within a few days.

43. The fraudulent proceeds of the ticket reselling transactions were delivered to Defendant through checks and a PayPal account registered to Defendant.

44. Defendant, in less than one year, made and attempted to make more than $25,000 worth of fraudulent ticket purchases on ScoreBig with unauthorized credit cards, all in violation of Title 18, United States Code, Section 1029(a)(2) and 2.

## COUNT 3
### (Unlicensed Money Transmitting Business, 18 U.S.C. § 1960 and 2)

The United States Attorney further charges:

45. The United States Attorney realleges and incorporates by reference the allegations set forth in paragraphs 1 through 44 of the Information as if fully set forth herein.

46. From in or around July 2014 to in or around January 2015, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendant did knowingly conduct, control, manage, supervise, direct, and own all or part of Cryptocoin Capital Management, CCCM, CCCAP Management, CCCapital Management, CCCM Trading, Mercede's Limited Investments, Mercede's Inevestments, Mercede's Trading Company (collectively hereinafter, "Defendant Companies"), money transmitting businesses that affected interstate and foreign commerce, and failed to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330 and regulations prescribed under such Section.

47. Defendant, through Defendant Companies, operated a bitcoin exchange service, enabling Defendant's customers to exchange cash for bitcoin, for a fee.

48. Defendant and Defendant Companies failed to register as a money service business under 31 U.S.C. § 5330 and its applicable regulations.

49. In furtherance of Defendant's unlicensed money transmitting businesses, Defendant established and caused to be established several bank accounts at Bank of America

11

and Chase Bank, federally insured financial institutions whose activities affected interstate commerce. Defendant regularly established and caused to be established new bank accounts after these financial institutions closed and threatened to close Defendant's accounts because of concerns regarding money laundering.

50. In furtherance of Defendant's unlicensed money transmitting business, Defendant regularly wired funds to LakeBTC in order to make daily purchases of approximately $10,000 to $40,000 in bitcoin from LakeBTC. LakeBTC transmitted the purchased bitcoin to digital wallets controlled by Defendant and Defendant Companies, from which Defendant immediately resold the bitcoin to customers, for a fee, through LocalBitcoins.

51. In reselling the bitcoin Defendant purchased from LakeBTC, Defendant caused customers of his bitcoin exchange businesses to make out-of-state cash deposits and wire transfers directly into Defendant's bank accounts. After receiving confirmation of a customer's deposit or wire transfer, Defendant converted the deposited cash to bitcoin, and then transmitted the bitcoin from Defendant's bitcoin wallet to the customer's bitcoin wallet.

52. Between August 2014 and January 2015, Defendant converted and transmitted approximately $1,456,870 worth of funds in furtherance of Defendant's unlicensed money transmitting business, all in violation of Title 18, United States Code, Sections 1960(a), 1960(b)(1)(B), and 2.

**FORFEITURE: COUNT 1**

The United States Attorney further charges:

53. The allegations contained in Count 1 of this Information are hereby re-alleged and incorporated by reference as if fully set forth herein for the purpose of alleging forfeiture pursuant to the provisions of 18 U.S.C. § 982(a)(2). As a result of this offense, defendant

DANIEL J. MERCEDE shall forfeit to the United States all property constituting, or derived from, proceeds the defendant obtained, directly or indirectly, as the result of such offense; including, but not limited to, the following:

    a.    12 gold bars – weighing approximately one (1) ounce each - having a total approximate value of $20,000, seized by the United States Postal Inspection Service.

    b.    Gold and gold coins valued at approximately $900.00.

    c.    Approximately $909 in U.S. Currency.

CAROLE S. RENDON  
United States Attorney

By: *Ann C. Rowland*  
ANN C. ROWLAND  
Deputy Criminal Division Chief